IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and **ARTHUR H. BUNTE, JR.**, as Trustee, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 16 C 2746 |
| **SIDNEY INSULATION, INC.**, a Missouri corporation, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Sidney Insulation, Inc. ("Sidney Insulation") is an insulation contractor in the St. Louis area owned by majority shareholder Sarah Sidney ("Sarah") and her minority shareholder siblings Kevin Sidney ("Kevin") and Patrick Sidney ("Patrick"). Their father David Sidney had owned a successful insulation company, Flexo Supply Company, Inc. d/b/a Stovey Company Division ("Stovey"), until it went out of business in 2011.

This action stems from Stovey's withdrawal from the Central States Pension Fund ("Pension Fund"[1]) on November 27, 2011 and its resulting withdrawal liability of $639,495.41 as determined under 29 U.S.C. § 1381(b), part of the Employee Retirement Income Security Act of 1974 ("ERISA") (P. St. ¶ 5). [2]

---

[1] This opinion uses that term throughout as a matter of convenience -- in fact the plaintiffs in this action are those stated in the case caption.

[2] All further references to ERISA provisions will take the form "Section --," omitting the prefatory "29 U.S.C. § --."

On April 30, 2013 this Court's colleague Honorable Matthew Kennelly entered judgment in favor of Pension Fund and against Stovey in the amount of $787,967.48 (P. St. ¶ 6). Because Stovey has not paid and cannot pay that withdrawal liability, Pension Fund brought this action to enforce that judgment against Sidney Insulation as a claimed successor to Stovey. That has generated cross-motions for summary judgment, and with those motions now fully briefed they are ripe for decision.[3]

**Legal Standards**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

---

[3] Pension Fund's LR 56.1 Statement of Material Facts will be cited "P. St. ¶ --" with Sidney's response cited "D. Resp. P. St. ¶ --," while Sidney's Statement of Facts will be cited "D. St. ¶ --." Pension Fund's Memorandum in Response to Sidney's cross-motion will be cited "P. Resp. Mem. --," while Sidney's Consolidated Memorandum in support of its cross-motion for summary judgment will be cited "D. Mem. --."

There is a potential added complexity where, as here, cross-motions for summary judgment are presented. Because the court must then adopt a dual perspective that this Court has often referred to as Janus-like, it must credit the nonmovant's version of any disputed facts as to each motion, and that could on occasion lead to the denial of both motions. Fortunately that is not the case here, for the undisputed facts readily suffice to cause Pension Fund's motion to be granted.

## **Factual Background**

Stovey was formed in 1922 (D. St. ¶ 7), and David Sidney took over the company from his father in 1981 (D. Dep. 6:13-15). Its business comprised two operations: It ran a supply house where it sold insulation materials to insulation contractors, and it provided insulation installation services as a subcontractor to mechanical contractors on commercial building projects (D. St. ¶ 8). Stovey's obligations to Pension Fund arose under collective bargaining agreements with Teamsters' Local Union No. 862 ("Local 862")(P. St. ¶ 4), agreements that David Sidney signed on behalf of Stovey (P. St. ¶ 11).

Starting in the 2000s Stovey ran into financial trouble when it was routinely named as a defendant in a national wave of asbestos liability lawsuits (D. St. ¶ 18). When the company's liability insurance ran out, Stovey found itself unable to secure bonds for new insulation projects (id.). From about 2006 to 2010 Stovey's annual income shrank from $1.5 million to $22,908 (P. St. ¶ 23). Although Stovey ceased contracting about 2007 or 2008, it continued to operate its supply house business until 2011 (D. St. ¶ 19). Then in November 2011 Stovey terminated its sole warehouse employee and ceased making contribution payments to Pension Fund (D. St. ¶ 19). David Sidney was Stovey's sole shareholder at the time of its withdrawal from Pension Fund (P. St. ¶ 8).

As is often the case in family-owned businesses, David's children worked for the company at various points throughout its existence. Sarah worked at Stovey during the 1990s (D. St. ¶ 11), after which she moved to various other cities to pursue educational and career opportunities until she returned in 2002 to work at Stovey again, acting in a clerical position (D. St. ¶ 11, 12).

It should be acknowledged at this point that there is an area of the factual background on which the litigants part company: the roles that Sarah played over the years vis-a-vis both Stovey and Sidney Insulation. For their part defendants insist that Sarah was never an officer of Stovey, nor did she hold any position as a director or manager (D. Resp. P. St. ¶ 19)), nor did she handle payroll (D. St. ¶¶ 11, 12), while for its part Pension Fund asserts that Sarah served as a Stovey board member in 2004 and as an officer in 2004 and 2005 (P. St. ¶ 24 (d)). Notably, Sarah is referred to as an officer of Stovey in its 2004 and 2005 tax returns (P. Ex. H at 30) and as an officer and member of Stovey's board of directors in its 2004 filings with the Missouri Secretary of State (D. Dep. Ex. A).[4] Pension Fund claims (1) that Stovey's accountant had erroneously listed Sarah as an officer and director in 2004 and (2) that in actuality Sarah would have been prohibited by law from being an officer or director of Stovey while owning a WBE "at the same time" (D. Resp. P. St. ¶ 19).[5]

---

[4] David Sidney's deposition will be cited "D. Dep. --" with Sarah Sidney's deposition cited "S. Dep. --"

[5] It is not clear that Sarah would have owned a WBE "at the same time" as being listed as a director and officer of Stovey, for Sidney Insulation was not given WBE status until 2005 (P. Mem. 7). And as Pension Fund points out, holding a position on Stovey's Board of Directors may have benefitted Sarah in her subsequent application for WBE status (P. Resp. Mem. 7, citing City of St. Louis WBE Rules §§ II(C)(2)(c) and II(E)(8)).

But lest those differences impermissibly pre-signal the defeat of either or both summary judgment motions even before this opinion turns to the relevant legal analysis, a brief preview of a critical aspect of that analysis -- though normally out of place in the section of an opinion labeled Factual Background -- is in order. Remember first that the universally stated test of a Rule 56 motion is its showing of the absence of any "genuine issue as to any material fact" (Colotex Corp., 477 U.S. at 322-23). And for that purpose the universally stated definition of a "material fact" is set out in the seminal opinion in Anderson, 477 U.S. at 248:

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Hence, as the ensuing section of this opinion -- that labeled Sidney Insulation's Successor Liability -- will demonstrate in spades, the parties' just-described differences are not "material" -- not even potentially outcome-determinative. And that being so, the later legal analysis can proceed apace to decide whether summary judgment may properly be granted.

But to return to the factual background as such, it is undisputed that in 2004 Sarah incorporated Sidney Insulation, a company whose primary business is also insulation, as its sole shareholder (D. Resp. Mem. 4). Sarah applied for but was denied certification as a WBE in 2004 (S. Dep. 35:7-13). One year later she applied again and received such certification (id.), which conferred special status under Missouri law in competing for bids (D. St. ¶ 13). From 2006 to 2010 Sidney Insulation's annual income grew from $539,703 to $1.2 million (P. St. ¶ 23).

Sidney Insulation and Stovey are both in the business of installing insulation, though Sidney Insulation asserts that its target market was quite distinct from Stovey's because it worked on much smaller scale projects, including "setasides" for minority-owned businesses (D. St.

¶ 13). But documents from Enterprise Bank also listed a casino, Washington University and a township as some of Sidney Insulation's contracts in 2007 (P. St. Ex. G at 3).

In 2007 and 2008 Sidney Insulation purchased from Stovey some vehicles and a host of equipment needed to construct and install insulation (P. St. ¶¶ 10, 11, 26). At one point Stovey also supplied insulation to Sidney Insulation, among other users (P. St. ¶ 28). When Stovey started sourcing its insulation from third parties, Sidney Insulation began buying insulation from those same suppliers (id.).

Sidney Insulation and Stovey ran at least part of their operations out of the same warehouse space at 5701 Manchester Road in St. Louis (P. St. ¶ 22). For official purposes, however, Sidney Insulation listed its business address at Sarah's personal residence in Webster Grove, Missouri (id.). In 2007 Stovey sold the Manchester Road building to DMC, LLC, which is owned in equal shares by Sarah, Kevin, Patrick and Megan Minnear, David Sidney's daughter-in-law (D. St. ¶ 28). DMC leased the building to Sidney Insulation, and then Sidney Insulation subleased part of the building back to Stovey (P. St. ¶ 22). As Stovey needed less space for its operations, Sidney Insulation expanded (id.). Although Sidney Insulation listed its address as 130 Roseacre Lane (Sarah's residential address) on its report filed with the Missouri Secretary of State, Enterprise Bank notes on its loan documents that Sidney Insulation operates out of the Manchester Road address (P. St. Ex. G at 23).

Sarah started Sidney Insulation with money she had from an inheritance as well as a personal loan from David Sidney (D. St. ¶ 13). In the latter part of 2008 Sidney Insulation received a line of credit from Commerce Bank that was cross-collateralized with Stovey and personally guaranteed by both Sarah and David (P. St. ¶ 25). Pension Fund also provides documentation showing that on July 2, 2007, Sidney Insulation received a line of credit from

Enterprise Bank and Trust in the amount of $210,000, the stated purpose of which was to pay off debt to Stovey (P. St. ¶ 25).  David and Sarah also personally guaranteed the Enterprise loan (id.).

Members of the Sidney family have held positions at both Stovey and Sidney Insulation.  In 2009 Sarah's brothers Kevin and Patrick purchased minority shares in Sidney Insulation (D. St. ¶ 24).  In addition to being Sidney Insulation shareholders, Patrick is a vice president and estimator and Kevin works in the warehouse (P. St. ¶ 24(f), (h)).  Both brothers had worked at Stovey in earlier years, Kevin as a warehouseman and Patrick as an insulator (id.).  As for the siblings' father David, after winding down Stovey's operations in 2011 he consulted for several large insulation businesses, including Sidney Insulation, while doing business as Insulation Consultants LLC (P. St. ¶ 24(d)).  In 2014 he abandoned his LLC and joined Sidney Insulation as an estimator (id.).

To carry out the work of installing insulation, Sidney Insulation also employed members of the same local union (Local 1) that had been used by Stovey for the same work (P. St. ¶ 4(a)), and both Sarah and David were signatories to collective bargaining agreements with Local 1 (D. Resp. P. St. ¶ 24).  Sidney Insulation employed Tim Lischwe and Nick Eaton as vice president and corporate secretary, respectively, after they had been employed by Stovey as estimators and had sat on its board of directors (P. St. ¶ 24(b), (g)).  Sidney Insulation also employed John Buffa and listed him as a vice president after he had likewise worked at Stovey as an estimator and sat on its board of directors (P. St. ¶ 24(c)).  And finally, Sidney Insulation employed Christopher Smith as a warehouseman (he had previously worked for Stovey as a truck driver) (P. St. ¶ 24(i)).

Sidney Insulation insists that it ran its business as an entity wholly distinct from Stovey and that it merely purchased its equipment, operated from the same location and hired its people as a matter of convenience (D. Mem. 5-6). Indeed, Sidney Insulation claims that Stovey's steady decline in business and operations had everything to do with asbestos liability and financial challenges and nothing to do with plans for Sarah to "take over" Stovey when David retired (D. St. ¶¶ 18, 19). But Pension Fund asserts that the separation of businesses was a mere formality and that for all intents and purposes Sidney Insulation took over Stovey when David was ready to retire, with a clear continuity of operations (P. Mem. 3-4). To bolster that claim Pension Fund provides a statement under the heading "Relationship Manager Commentary," taken from documents prepared by Enterprise Bank with respect to Sidney Insulation's line-of-credit application (P. Ex. G at 3):

> Sidney Insulation is a young company. Sarah's father owns the Stovey Company, which is a large insulation installer. Sarah started her company in September of 2004 and had her first full year of operations in 2005. As her father is gearing up for refirement he is winding down the operations of Stovey. Because she is a woman owned business and knew it would be benefit to have the WBE Certification as a minority owned company, it prevented her from "taking over" Stovey. So as Stovey winds down, Sidney insulation is growing quickly. She has received several large contracts because of the WBE designation, including: The new Pinnacle Casino of approx. $700M for 2007, Washington University and Rock Hill Township. Sarah's father was big in the industry so she has retained her maiden name for the familiarity, she has also hired a well known gentlemen in the industry that has a wide following. He has been instrumental in the company's rapid growth as well.

### Sidney Insulation's Successor Liability

Designed to maximize fluidity of corporate assets, the common law rule is that "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities" (<u>Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of</u>

Pontiac, 920 F.2d 1323, 1325 (7th Cir. 1990) (internal citation and quotation marks omitted)).[6] That general rule is limited by any of four exceptions: where "(1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring of the two corporations; (3) the purchasing corporation is a 'mere continuation' of the seller and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts" (id. at 1325-26).

But the Supreme Court has also imposed successor liability in other instances when doing so is necessary to vindicate an important federal statutory policy, when there is notice to the successor and when there are sufficient indicia of continuity of operations (id. at 1326). One such important federal statutory policy is embodied in the Multiemployer Pension Plan Amendments Act of 1980 ("Multiemployer Plan Act"), which amended ERISA "by imposing liability on employers who withdraw, partially or completely, from participation in an underfunded multiemployer pension fund" (Board of Trs. of Auto. Mechanics' Local No. 701 Union & Industry Pension Fund v. Full Circle Group, 826 F.3d 994, 995 (7th Cir. 2016)).[7] Because multiemployer pension plans are defined-benefit, all the remaining employers have to make up the difference when one employer fails to make its required contribution (Artistic Furniture, 920 F.2d at 1327-28).

Congress passed the Multiemployer Plan Act "in order to 'relieve the funding burden on remaining employers' and to 'avoid creating a severe disincentive to new employers entering the plan. . .'" (Artistic Furniture, 920 F.2d at 1328 (quoting H.R. Rep. No. 96-869, pt. 1, at 67

---

[6] Hereafter that opinion is cited for convenience as "Artistic Furniture."

[7] Hereafter that opinion is cited for convenience as "Full Circle."

(1980), as reprinted in 1980 U.S.C.C.A.N. 2918, 2935)). Affording statutory status to employers' contractual duties toward multiemployer pension plans (see Section 1145), the Multiemployer Plan Act also authorized certain parties to sue in federal court to enforce those obligations (see Section 1132) (Artistic Furniture, 920 F.2d at 1328). Hence imposition of successor liability is entirely appropriate when necessary to enforce the withdrawal liability section of the Multiemployer Plan Act if the other tenets of successor liability are met (id.).

Because successor liability is an equitable doctrine, a court considering its imposition should "carefully balanc[e] the need to vindicate important federal statutory policies with equitable considerations" (Tsareff v. ManWeb Servs., 794 F.3d 841, 845 (7th Cir. 2015)). Here imposing successor liability on Sidney Insulation is appropriate if there was adequate notice and if Sidney Insulation and Stovey exhibited operational continuity.

**<u>Notice</u>**

Notice of withdrawal liability can be either actual or implied (Artistic Furniture, 902 F.2d at 1329), and as to the latter alternative "[n]otice can be implied from a variety of circumstances, such as common control or proximity" (Sullivan v. Running Waters Irrigation, Inc., 739 F.3d 354, 357 (7th Cir. 2014), citing Artistic Furniture). And Full Circle, 826 F.3d at 997 has concluded that when a successor knew that the predecessor's workers were unionized "[t]hat knowledge should have alerted him to the possibility of withdrawal liability, which he could have verified by asking [the predecessor] to get an estimate from the union of the union's liabilities to its members. (See Section 1021(l))."

Summary judgment doctrine requires federal courts to draw all reasonable inferences in favor of a non-movant (Lesch, 282 F.3d at 471). But of course the doctrine's operative word in

that respect is "reasonable" -- a court is not obligated to draw all possible favorable inferences to enable a litigant to escape summary judgment.

In this instance the undisputed facts show that at a minimum Sarah, as a former employee of the predecessor company and daughter of its owner, had the necessary implied knowledge of Stovey's withdrawal liability. In an unpersuasive effort to escape that showing, Sidney Insulation contends that Sarah was never an officer of Stovey and that its accountant listed her as an officer on the tax returns "erroneously" (D. Mem. 6), and it contends further that she did not know of a collective bargaining agreement that provided for participation in the Pension Fund (D. Mem. 9).

But it strains credulity past the breaking point to accept a contention that when Sarah was employed at Stovey, and as she built her own business that delivers exactly the same services as Stovey, she was not "intimately familiar with [Stovey's] operations." At the very least Sarah must have known that the trucking and warehouse workers at Stovey were unionized (note that her brother Kevin -- who later went on to work at Sidney Insulation and to own 14 percent of the company -- was himself a member of Local 682) (P. St. ¶ 12). And Sidney Insulation employs and is party to a collective bargaining agreement with the same asbestos workers union (Local 1) that Stovey dealt with. As Full Circle, 826 F.3d at 997 teaches as a matter of law, such a concatenation of factors "should have alerted" Sidney Insulation to "the possibility of withdrawal liability."

Sidney Insulation also denies that David had "any knowledge about much less the concept of withdrawal liability" before Sidney Insulation purchased Stovey's assets in 2009 (D. Mem. 9). But whether or not that is so is wholly irrelevant as a matter of law. Remember that our Court of Appeals imposes withdrawal liability on a successor who is aware that the

predecessor's workers are unionized yet is ignorant of the fact or concept of withdrawal liability -- and that being so, it would make no sense at all to excuse the predecessor from the congressionally-created (and court-honored) withdrawal liability because of the same level of ignorance. David Sidney had operated his business for decades, and his company was a party to the collective bargaining agreement with Local Union 862. It is simply unacceptable for him to play ostrich, figuratively hiding his head in the sand.

To shift to another aspect of the requirement of notice to impose successor liability, that requirement is imposed in part to protect "an innocent purchaser who did not have an opportunity to protect itself by obtaining indemnification or negotiating a lower purchase price" (<u>Tsareff</u>, 794 F.3d at 849). Sidney Insulation is not in need of such protection, because it was not an "innocent purchaser." To the contrary, it availed itself of the benefits of operating as a quasi-joint family company with Stovey during the seven years that the two co-existed. On that score the <u>Factual Background</u> section has already reflected that David sold Stovey's building to an LLC, 3/4 of which was owned by Sidney Insulation's shareholders, enabling that LLC to lease the building back to Sidney Insulation and Stovey. With the four Sidney family members thus involved in three separate legal entities with overlapping ownership, they cannot call on any notion that reasonable inferences spare them from "notice" as construed under controlling caselaw.

**<u>Continuity of Operations</u>**

Our Court of Appeals has regularly taken a totality-of-the-circumstances approach to finding successor liability, weighing a number of factor (see, e.g., <u>Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Centor Contractors, Inc.</u>, 831 F.2d 1309, 1312 (7th Cir. 1987)). In deciding whether the continuity-of-operations factor has been established, <u>Artistic Furniture</u>, 920 F.2d at 1329 considered that the successor had "employed substantially all of Pontiac's [the

predecessor's] workforce and it appears, supervisory personnel as well. It used Pontiac's plant, machinery, and equipment and manufactured the same products," and two vice presidents stayed on as senior management of the successor company.

"Continuity of operations" deals with a different factual scenario in the present case, because rather than entering into a merger or acquisition Sidney Insulation and Stovey co-existed for approximately seven years, technically as separate companies. But the undisputed facts show that for all intents and purposes such separation was indeed a mere technicality rather than a real-world substantive difference, for the companies shared assets, and over time Sidney Insulation came to acquire much of Stovey's space, workers and operational infrastructure.

More specifically, rather than selling Stovey to his daughter Sarah or grooming her to take over that company David gradually transferred his workers, trucks and equipment to Sidney Insulation. And on a related[8] front, he sold his warehouse to an LLC comprising his three children and his daughter-in-law Megan Minnear, who then leased the property back to both Stovey and Sidney Insulation, where they shared space for a number of years before Sidney Insulation slowly took over more of the space as Stovey reduced operations. Moreover, David also used his own personal funds and his own company as collateral to finance Sidney Insulation. And after closing Stovey's doors, he eventually joined Sidney Insulation as a consultant and then as a full-time employee.

In a classic example of a lawyer's often-perceived function as advocate "to make the worse appear the better reason,"[9] Sidney Insulation asserts that Stovey's transfer of workers,

---

[8] Bad pun intended.

[9] Aristophanes, <u>Clouds</u>.

assets and space was a matter of coincidence and convenience, that Stovey wound down its business because of the high costs of asbestos liability, that Stovey sold its assets to Sidney Insulation at fair-market value (which is hardly relevant) and that Sidney Insulation merely "poached" employees from Stovey, as it would do to any other company (D. St. ¶ 9). Those makeweight contentions do not obscure the already-discussed factors that conclusively establish the continuity of operations -- note the related factor that although Sidney Insulation may have started with smaller scale contracts than Stovey's "hospitals and sports stadiums" (D. St. ¶ 9), by 2008 it listed on its Enterprise loan documents contracts for a casino, a township and a university (see P. Ex. G at 3).

Indeed, any scintilla of doubt as to Sidney Insulation's status as a clear successor to Stovey would be dispelled by the description of the two companies' relationship in the Enterprise loan document -- a smoking gun, in actuality. To repeat part of the earlier-quoted excerpt from that document, here is the image of their relationship that the two companies themselves projected in order to receive financing:

> As her father is gearing up for retirement he is winding down the operations of Stovey. Because she is a woman owned business and knew it would be beneficial to have the WBE Certification as a minority owned company, it prevented her from "taking over" Stovey. So as Stovey winds down, Sidney Insulation is growing quickly.

Thus Sidney Insulation has taken full advantage of its predecessor-successor relationship with Stovey by holding itself out as such for the purposes of financing. And the accuracy of that portrayal is confirmed by all of the factors that this opinion has recounted -- factors such as its acquisition of Stovey's personnel, together with their expertise gained while working at Stovey, and its occupancy of space that was sold by Stovey to an LLC largely owned by David's children who are Sidney Insulation's shareholders. It would be wholly unjust for this Court to allow

Sidney Insulation to enjoy such benefits while absolving the company of responsibility for its predecessor's withdrawal liability to Pension Fund.

## Conclusion

There is no genuine issue of material fact that stands in the way of a summary judgment in favor of Pension Fund. This Court grants its summary judgment motion (Dkt. No. 26), ruling that Sidney Insulation, Inc. is liable as the successor to Stovey for withdrawal liability, and of course it denies the cross-motion by Sidney Insulation, Inc. (Dkt. No. 33). Judgment is ordered to be entered in favor of Central States, Southeast and Southwest Areas Pension Fund and Arthur H. Bunte, Jr. as Trustee against Sidney Installation, Inc. in the sum of the following amounts:[10]

1. $639,495.41 in withdrawal liability;

2. $137,478.52 in interest;

3. $137,478.52 in liquidated damages;

4. $21,609.00 in attorney's fees;

5. $2,372.51 in costs;[11]

6. additional interest on the withdrawal liability of $639,495.41 that will have accrued from October 16, 2016 to the date of payment, calculated at an annualized interest

---

[10] These amounts do not reflect any amount for reasonable attorney's fees and costs incurred for the period since October 16, 2016. Pension Fund may hereafter file a claim for such additional amount pursuant to Section 1132(g), but the potential for such filing shall not affect the finality of this judgment (see Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202-03 (1988)), and as such there is no need to make a determination under Rule 54(b).

[11] Items 1 through 5 reflect the amounts due as of October 16, 2016 as itemized in Pension Fund's Mem. 14-15 and described in its Statements of Material Facts 29 through 32, all of which were admitted by Sidney Insulation.

rate of 2% plus the prime interest rate established by JPMorgan Chase Bank, N.A. for the 15th day of the month for which interest is charged;

7. additional liquidated damages equal to the amount of interest provided for in item 6.

This is the final judgment in this action.

_____
Milton I. Shadur
Senior United States District Judge

Date: January 23, 2017